COMMONWEALTH OF MASSACHUSETTS, FIRST DISTRICT COURT BOSTON, MASSACHUSETTS

JOSE MARIA DECASTRO,              )
1258 Franklin St.                 )
Santa Monica, CA 90404            )
Plaintiff,                        )
                                  )
v.

Civil Action No. _____

DALE HILLER a/k/a "LackLuster,"                       )
JOSHUA ABRAMS a/k/a "Accountability For All,"         )
KATE PETER a/k/a "Masshole Mafia,"                    )
and JOHN DOES 1 through 5,                            )
Defendants.                                           )

**COMPLAINT FOR DEFAMATION AND FALSE LIGHT**

Plaintiff Jose Maria DeCastro, appearing pro se, brings this complaint against Defendants Joshua Abrams, Dale Hiller, Kate Peter, and John Does 1 through 5, and alleges as follows:

1. Plaintiff Jose Maria DeCastro is a resident of California and a public constitutional rights advocate known online as "Delete Lawz" or "Chille."
2. Defendant Joshua Abrams, also known as "Accountability For All," is a Massachusetts resident who hosts and publishes content through a YouTube channel with approximately 238,000 subscribers.
3. Defendant Dale Hiller, known publicly as "LackLuster," is an online video producer with over 1 million subscribers. He resides outside Massachusetts but regularly broadcasts content to a nationwide audience, including into the Commonwealth.
4. Defendant Kate Peter, known publicly as "Masshole Mafia" and "Troll Mafia Official," is a Massachusetts resident who hosts a YouTube channel with nearly 38,000 subscribers.
5. Defendants John Does 1 through 5 are individuals whose identities are presently unknown but who participated in, contributed to, or promoted the dissemination of the defamatory statements described herein.
6. Jurisdiction and venue are proper in this Court pursuant to Massachusetts General Laws ch. 223 and 223A, §§ 3(c) and (d), because Defendants intentionally directed their defamatory conduct into Massachusetts and caused harm therein. Abrams and Peter are Massachusetts residents. Abrams hosted the defamatory livestream from Boston, and Plaintiff was present in Boston with Abrams just days before the broadcast. The broadcast targeted Massachusetts audiences and involved Massachusetts-based conduct and individuals.

7. On or about June 1, 2022, just after Memorial Day, Defendants appeared in a livestream video hosted by Defendant Abrams in which they made numerous knowingly false, defamatory, and malicious statements about Plaintiff.
8. During that livestream, Defendant Abrams made several specific and maliciously false claims. He falsely alleged that Plaintiff strangled someone. Abrams then stated that Plaintiff went to a friend's house in New Hampshire, kicked his friend out, told him to go stay in a hotel, and then used the home to do drugs. Abrams claimed that the friend returned at 6:00 a.m., found drug paraphernalia scattered throughout the house, and then kicked Plaintiff out. He also accused Plaintiff of creating fake app screen designs — referred to as "pillow poppers" — in collaboration with his cousin, in order to fraudulently obtain a large investment from an investor. Abrams additionally accused Plaintiff of blackmailing people. Each of these allegations is completely false and defamatory per se.
9. These statements are categorically false. Declarant A, a military veteran and hedge fund manager who resides in New Hampshire and hosted Plaintiff at the time, has submitted a sworn declaration refuting the entire story as fabricated. Declarant B, a technologist and U.S. military veteran residing in Phoenix, Arizona, and Plaintiff's cousin, has submitted a sworn declaration confirming that no app fraud occurred. The names and identifying information of Declarants A and B have been redacted to protect them from online harassment, doxxing, and business retaliation by defendants and their associates. Full unredacted versions are available for in-camera review by the Court upon request.
10. Abrams also accused Plaintiff of using his credit card without permission to pay for a hotel room. This claim is demonstrably false. As evidenced by Plaintiff's bank records attached as Exhibit D, Plaintiff paid for the hotel stay with his own funds—$386.06 on May 29, 2022, and $85.74 on May 30, 2022, both at Knights Inn Danvers, Massachusetts. Additionally, Plaintiff sent Abrams $205.00 via electronic payment on May 28, 2022, with the note 'For thx man,' showing that Plaintiff had already reimbursed Abrams prior to the alleged incident. These records demonstrate that Abrams knowingly made a false accusation in an effort to malign Plaintiff's character and credibility. This constitutes defamation per se and supports a finding of actual malice.
11. Abrams also edited video footage of Plaintiff's interaction with Defendant Kate Peter in a misleading way. He removed critical context showing that Defendant Peter stepped on the back of Plaintiff's shoes, which caused Plaintiff to lean backward defensively. Abrams presented a slowed-down version of Plaintiff's reaction, making it appear aggressive. In the same video, Abrams stated, "All I'm guilty of is pausing the video," downplaying the extent of the edits. This misleading presentation distorted the truth and contributed to the negative public perception of Plaintiff.
12. Defendant Hiller stated: "There are victims. There is proof of it. That's all I can say for now. Hopefully more will be revealed." This deliberately vague and ominous assertion strongly implies that Plaintiff has committed violent acts against others, potentially including physical abuse toward women. While Hiller did not specify the nature of these alleged 'victims,' the statement, in the context of surrounding commentary by co-defendants and the video's framing, invites the viewer to draw the false and damaging conclusion that Plaintiff has engaged in violent criminal conduct. Given that Defendant Kate Peter was the primary target of Plaintiff's verbal interactions in the video, and Hiller appeared in her defense, his statement further suggests to the audience that Plaintiff has a

pattern of aggression toward women. Although the statement was broadcast on the 'Accountability For All' channel and not on Hiller's own platform, Hiller made the statement publicly, with full knowledge that it would be disseminated to a wide audience. His participation in the broadcast and his deliberate insinuation that Plaintiff has harmed unnamed 'victims' constitutes defamation per se. It was made with reckless disregard for the truth and with the clear intent to damage Plaintiff's reputation.

13. Plaintiff contacted Defendant Hiller on three separate occasions to request a public retraction. Hiller refused to retract or amend the defamatory statement.
14. Defendant Kate Peter stated: "He also employs blackmail and extortion and threats a lot," and further alleged that Plaintiff operates a Ponzi scheme. She described this supposed scheme as one in which Plaintiff solicits funds from new investors to pay off previous investors, suggesting criminal fraud and financial deception. Peter made these allegations without evidence or due diligence. She continued by speculating about Plaintiff's criminal history, despite admitting that she had not verified the claims. These statements were intentionally designed to portray Plaintiff as fraudulent, threatening, and morally corrupt, and they constitute defamation per se.
15. These accusations were made to a large audience through her YouTube channel "Troll Mafia Official," formerly "Masshole Mafia," and were intended to cause reputational harm to Plaintiff and alienate him from professional networks and public credibility.
16. In addition to the foregoing, Defendant Kate Peter falsely claimed during the livestream that Plaintiff has multiple liens filed against him. This statement was made without any supporting documentation or investigation and was intended to portray Plaintiff as financially irresponsible and legally compromised. In truth, Plaintiff has no such liens. This false statement further contributed to the damage of Plaintiff's credibility, trustworthiness, and professional relationships, and constitutes defamation per se.
17. Defendant Hiller has previously been sued for defamation in the case of Goetz v. Hiller, filed in the U.S. District Court for the Northern District of Illinois in 2024. In that case, Chicago Police Sergeant Ignatius Goetz alleged that Hiller falsely identified him on social media as the officer who had made an obscene gesture during a protest. The lawsuit alleged defamation and related claims. The case concluded with a settlement in which Hiller agreed to a financial resolution, and the court retained jurisdiction to enforce the settlement terms. This demonstrates that Hiller is aware of the legal boundaries regarding false and defamatory speech and supports the conclusion that his conduct toward Plaintiff was intentional and carried out with actual malice.
18. Each Defendant acted with actual malice or, at minimum, reckless disregard for the truth. Their statements were designed to humiliate, discredit, and destroy Plaintiff's professional and public standing as a First Amendment activist.
19. The defamatory statements constitute defamation per se under Massachusetts law because they accuse Plaintiff of crimes, immoral conduct, and professional dishonesty. As a result, damages are presumed.
20. The transcript cited herein was produced from the original livestream video hosted by Defendant Abrams and preserved by Plaintiff with complete metadata and timestamp integrity. Plaintiff is prepared to submit the video and full transcript for judicial review.
21. The reputational harm from these broadcasts has inflicted untapped earnings loss. Many viewers influenced by these statements will never engage with Plaintiff's work again.

The damage is ongoing, cumulative, and devastating to Plaintiff's potential reach, credibility, and future revenue.

CLAIMS FOR RELIEF

COUNT I – DEFAMATION (Against All Defendants)
22. Plaintiff re-alleges all preceding paragraphs.
23. Defendants published false and defamatory statements of fact regarding Plaintiff.
24. These statements were made with actual malice and harmed Plaintiff's reputation.

COUNT II – FALSE LIGHT (Against All Defendants)
25. Defendants publicly cast Plaintiff in a false light that would be highly offensive to a reasonable person.
26. These false impressions were conveyed to millions of viewers and caused severe reputational harm.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court: a. Award compensatory damages in the amount of $1,000,000.00, divided as: i. $400,000.00 for reputational harm and loss of professional opportunity; ii. $300,000.00 for emotional distress; iii. $300,000.00 for general damages related to public stigma and future earning loss; b. Award punitive damages for willful and malicious conduct; c. Award costs, and pro se legal fees at $400/hour for research, drafting, and filing; d. Grant any additional relief the Court deems just and proper.

Dated: May 27, 2025

Respectfully submitted,

/s/ Jose Maria DeCastro

Jose Maria DeCastro

1258 Franklin Ave.

Santa Monica, CA 90404

Email: deletelawz@gmail.com

Phone: (310) 555-1234

Plaintiff, Pro Se

DECLARATION OF [REDACTED FOR WITNESS PROTECTION]

I, [REDACTED], declare as follows:

1. I am a United States veteran and currently employed as a hedge fund manager based in New Hampshire. I make this declaration based on personal knowledge and am willing to testify under oath to the facts stated herein.
2. On the day following Memorial Day 2022, my friend and associate, Jose "Chille" DeCastro, came to visit me at my home in New Hampshire. This was his first time visiting me there, and I was glad to host him.
3. Upon his arrival, I greeted him and welcomed him into my home. I introduced him to my adult children—my son and daughter—before we settled in.
4. Later that evening, Chille and I went to a local establishment for dinner and a drink. Chille rarely drinks alcohol, so I considered it a gesture of friendship that he had a drink with me. We each had two drinks, and afterward, we walked back to my home together.
5. I set up a spare room for Chille to sleep in. The next morning, we all woke up around 8:30 AM. My daughter had made breakfast, and the four of us—myself, my son, my daughter, and Chille—shared a meal.
6. Chille informed me that he had other business to attend to while in New Hampshire. I walked him to the door, shook his hand, and gave him a double-tap hug. I invited him to stay another night, which he politely declined. He then departed.
7. That is the full extent of what occurred during the approximately 18 hours Chille was with me in New Hampshire.
8. I was later made aware of a video circulating online which misrepresents these events. I was shocked by the content and immediately told Chille I would provide this written declaration and testify to the truth.
9. To be crystal clear: Chille never asked or demanded that I leave my home, nor did I stay in a hotel. I never returned from any hotel to find drug paraphernalia in my house. I never "kicked him out." None of those allegations are true—not in whole or in part.
10. Both of my children are young adults and were present throughout the visit. If requested by the Court, I will ask them to provide written statements confirming these facts.

I declare under the penalty of perjury under the laws of the United States and the Commonwealth of Massachusetts that the foregoing is true and correct.

Executed on [REDACTED DATE],
at [REDACTED CITY],
New Hampshire
[SIGNATURE REDACTED]



## DECLARATION OF [REDACTED FOR WITNESS PROTECTION]

I, [REDACTED], declare as follows:

1. I am a United States military veteran and a full-time technologist. I own and operate my own technology company and also serve as a subcontractor for a major corporation. I am the cousin of Jose DeCastro. I submit this declaration under penalty of perjury in response to a video that was brought to my attention.

2. I take my oath to the Constitution—and swearing under penalty of perjury—as seriously as a heart attack. I have been in wars and have seen men die. In situations like those, all you have is your word. I will not break mine for my cousin or for anyone else.

3. On or about Memorial Day 2022, I had a 30-minute phone conversation with my cousin regarding an app we had been collaborating on for over a year. I was aware during the call that Mr. Josh Abrams was listening in, so I took the opportunity to educate both men on the complexities of the application Mr. DeCastro was seeking to build.

4. The conversation was productive, and I ended the call feeling confident that I had explained the expensive and technically complex nature of software development.

5. At no time did I create or design any application screens for Mr. DeCastro. That did not happen then, and it has not happened to this day.

6. To the best of my knowledge, Mr. DeCastro never received a large investment sum for the development of the application I was working on. What I can state definitively is that had he received such funding, we would have formalized the arrangement through a contract and I would have commenced work.

7. I am a full-stack developer, fully capable of handling both front-end and back-end application development. I am also a website expert and can build systems in virtually any programming language. The allegation that I created what were referred to as "pillow popper screens" is not only false—it is an insult to any competent technologist.

8. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. I am willing to be deposed and testify under oath to the facts stated above.

Executed on [REDACTED DATE],

at [REDACTED CITY], Arizona.

**[SIGNATURE REDACTED]**